**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

**v.**

**NATIONAL MARINE FISHERIES SERVICE, et al., Defendants.**

**No. C02–2259L.**

United States District Court, W.D. Washington, at Seattle.

Dec. 12, 2002.

Todd D. True, EarthJustice Legal Defense Fund, Seattle, WA, Jan Erik Hasselman, Nat. Wildlife Federation, Seattle, WA, for plaintiffs.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Fred R. Disheron, Ruth Ann Lowery, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for defendants.

Julie Sobotta Kane, David J. Cummings, Office of Legal Counsel, Lapwai, ID, for Nez Perce Tribe of Idaho, interested party.

B. Scott Whipple, Brian J. King, Schwabe, Williamson & Wyatt, Portland, OR, for Lower Granite Navigation Coalition.

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

LASNIK, District Judge.

## I. INTRODUCTION

This matter comes before the Court on a preliminary injunction motion filed by plaintiffs National Wildlife Federation, *et al.* ("Plaintiffs"). Plaintiffs seek a preliminary injunction against defendants U.S. Army Corps of Engineers (the "Corps") and the National Marine Fisheries Service ("NMFS")[1] (collectively, "Defendants"). Specifically, Plaintiffs seek to enjoin the Corps from commencing dredging and dumping of the dredge spoils in the lower Snake River and to enjoin NMFS from proceeding with the authorization of any "incidental take" of certain salmonid species listed under the Endangered Species Act ("ESA") that Plaintiffs allege would otherwise occur if the Corps proceeds with the planned dredging. For the reasons

1. Defendants note and the Court recognizes that "NMFS is now known as 'NOAA Fisheries.'" (Response at 2). However, because most of the materials relevant to this proceeding refer to "NMFS," *see, e.g.*, Hasselman Decl. Ex. 14 (Excerpts of NMFS Biological Opinion), for the sake of consistency and simplicity, the Court refers to "NMFS."

set forth in this Order the Court grants Plaintiffs' preliminary injunction motion.[2]

## II. FACTS

The Corps operates and maintains a series of dams in the Columbia–Snake River inland navigation waterway, which includes the Ice Harbor, Lower Monumental, Little Goose, and Lower Granite Reservoir on the Snake River, and McNary Reservoir on the Columbia River and three other dams on the lower Columbia River. *See* Dredged Material Management Plan and Environmental Impact Statement (July 2002) ("DMMP/EIS") at ES–1.[3] The dams on the Columbia and Snake Rivers provide hydroelectric power generation and permit navigation from the mouth of the Columbia River to port facilities on the Snake and Clearwater Rivers in Lewiston, Idaho and Clarkston, Washington. *Id.* In addition to maintenance of the dams, the Corps maintains a navigation channel through the reservoirs. *Id.*

The DMMP is the Corps' twenty-year "programmatic plan" for maintenance of the navigation channel, maintenance of public facilities within the reservoirs, management of dredged materials from the reservoirs, and maintenance of flow conveyance capacity at the most upstream extent of the Lower Granite Reservoir. *Id.* The Corps anticipates dredging in the navigation channel and public recreation areas every other year for the next twenty years "for a total volume of up to 3,400,000 cubic yards ... of dredged material." DMMP/EIS at 2–11. A primary use of the dredged material is to create a "woody riparian habitat" for juvenile fall chinook salmon. DMMP/EIS at 2–42. Other uses may include fill and potting soil. Determination of how to utilize the dredged material will be made by the Corps, with input from the Local Sediment Management Group ("LSMG"). Hasselman Decl. Ex. 3, Record of Decision ("ROD") at 7. In addition to dredging and disposal of the dredged materials, the DMMP calls for raising by three feet the Snake River levee system through Lewiston, Idaho. DMMP/EIS at 2–26.

The DMMP also includes specific actions to be undertaken in the winter of 2002–03, which include dredging the navigation channel at the confluence of the Snake and Clearwater Rivers, port facilities in the Lewiston–Clarkston area, recreational facilities in the Lower Granite and Little Goose Reservoirs, and the navigation lock approaches to the Lower Granite and Lower Monumental Dams. DMMP/EIS at N–3. Dredged material will be used to create a "woody riparian area" and/or a "shallow water habitat" in the Lower Granite Reservoir. ROD at 8.

While developing the DMMP the Corps considered the requirements of several potentially applicable environmental laws and regulations. *See* DMMP/EIS § 5. Plaintiffs

2. Due to the time sensitivity of this matter, the Court issues this preliminary injunction having been provided and having reviewed less than the complete administrative record. The Court's conclusions regarding the likelihood of Plaintiffs' success on the merits are therefore preliminary. The parties should not interpret this Order as determining conclusively that Defendants' actions met or did not meet the requirements of applicable law. Such questions will be decided conclusively at trial or, as is more likely, upon the Court's consideration of motions for summary judgment.

3. Plaintiffs provided selected hard copy excerpts of the DMMP/EIS and a complete soft copy of the DMMP/EIS and its appendices on CD–ROM. *See* Hasselman Decl. Exs. 1–2. Defendants provided complete hard and soft copies of the DMMP/EIS and its appendices. *See* Sands Decl. Ex. A. For sake of simplicity and consistency, the Court cites generally to the DMMP/EIS, rather than to a specific exhibit to a particular declaration.

argue that in the course of developing the DMMP, the Corps failed to consider reasonable alternatives to the proposed action, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332(2)(C)(iii), (E). Specifically, Plaintiffs argue that the Corps failed to consider strategies to reduce the heavy inflow of sediment into the Lower Granite Reservoir by encouraging better upstream practices, strategies to use partial, temporary reservoir drawdowns and increased flows to "flush" sediment downstream, and strategies that would require the use of lighter loaded barges to reduce the need for dredging. (Motion at 6). Additionally, Plaintiffs allege that the Corps' economic analysis regarding the DMMP is fundamentally flawed. *Id.* at 9. Finally, Plaintiffs argue that NMFS violated the ESA and the Administrative Procedure Act ("APA") by issuing an invalid biological opinion. *Id.* at 11.

The Corps argues that, as a threshold matter, only the 2002–03 dredging component of the DMMP constitutes "final agency action" for purposes of judicial review pursuant to the APA.[4] (Response at 2, 22). The Corps insists that given the project's stated purpose and need, it considered the reasonable range of feasible alternatives. *Id.* at 28. Defendants also argue that the Corps' cost-benefit analysis is sound and that the NMFS biological opinion complies with governing law. *Id.* at 32–34, 38–40. For these reasons Defendants maintain that issuance of a preliminary injunction is inappropriate.

## III. DISCUSSION

### A. Preliminary Injunction Standard.

In the Ninth Circuit issuance of a preliminary injunction is appropriate when a plaintiff demonstrates (1) the combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions regarding the merits and the balance of hardships tip sharply in its favor. *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992) (citations omitted). These are not separate tests, but rather represent a continuum of equitable discretion "in which the required probability of success on the merits decreases as the degree of harm increases." *Westlands Water Dist. v. Natural Res. Def. Council,* 43 F.3d 457, 459 (9th Cir.1994). Furthermore, "[i]n cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals,* 962 F.2d at 1400.

### B. Administrative Procedure Act Standard of Review.

Pursuant to the preliminary injunction test, the Court must evaluate Plaintiffs' likelihood of success on the merits. For purposes of that inquiry, Defendants' final agency actions made pursuant to the ESA or NEPA are reviewed in accordance with the APA. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981–82 (9th Cir.1985).

A court may disturb an agency's final action only if that final action is "arbitrary, capricious, an abuse of discretion, or

4. At oral argument Defendants suggested that Plaintiffs may not be appropriate parties to assert the alleged harms. Given the Ninth Circuit's permissive standards regarding standing and related doctrines, particularly in the context of environmental injuries, the Court finds that Plaintiffs are appropriate parties to assert the alleged harms. *See, e.g., Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir.2000); *Oregon Natural Res. Council v. United States Forest Serv.,* 59 F.Supp.2d 1085, 1089–90 (W.D.Wash.1999).

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000). A reviewing court must not "substitute its judgment for that of the agency" concerning the proposed action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Rather, a court must determine whether the decision was "based on a consideration of relevant factors" and whether "the agency has taken a 'hard look' at the environmental consequences of its proposed action." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998). The standard does not shield the agency from a "thorough, probing, in-depth review." *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1473, 1476 (W.D.Wash.1992) (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814).

█ An agency seeking to justify its action may not offer a new explanation for the action, but must be judged on the rationale and record that led to the decision. *City of Kansas City, Missouri v. Department of Hous. & Urban Dev.,* 923 F.2d 188, 192 (D.C.Cir.1991) ("arbitrary and capricious review ... demands evidence of reasoned decisionmaking at the agency level; agency rationales developed for the first time during litigation do not serve as adequate substitutes").

**C. Agency Action Subject to Review.**

█ The Corps argues that Plaintiffs' challenge to the DMMP is premature because the only Corps action sufficiently final for review is the dredging proposed for the winter of 2002–03. (Response at 5–6, 22–23). The Corps insists that because certain specific elements of the DMMP are "still under development" those elements of the DMMP other than the winter of 2002–03 dredging "are not properly the subject of judicial review by this Court at this time." *Id.* at 5–6, 22–23 (citing *Lujan v. National Wildlife Fed.,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)); *see also* Sands Decl. ¶ 33 ("The specific details of future dredging activities and beneficial uses are not known at this time .... However, specific information for the first year's dredging and disposal is available and that information is included in the DMMP/EIS Appendix N and modified in later documents, such as the DMMP ROD.").

Despite the argument present in Defendants' Response and Mr. Sands' statement that the only "specific details" known are for the 2002–03 winter dredging, there is scant support in the record for the proposition that only a small portion of the DMMP/EIS (specifically, Appendix N) should be considered "final action" for purposes of APA review. By their own terms, the DMMP/EIS and ROD provide that the action at issue is a twenty-year plan:

- "The DMMP/EIS is the U.S. Army Corps of Engineers' ... programmatic 20–year plan for maintenance of the authorized navigation channel in the lower Snake River reservoirs." ROD at 1.
- Brigadier General Fastabend "determined that adequate authority, NEPA documentation, and scientific rationale exist to implement the Dredged Material Management Plan *and* the 2002–2003 Dredging in the Lower Snake River Project and McNary Reservoirs." ROD at 14 (emphasis added).
- The purpose of the DMMP/EIS is "[t]o develop and evaluate alternative programs to maintain the authorized navigation channel and certain publicly owned facilities in the lower Snake River

and McNary reservoirs for the *next 20 years.*" DMMP/EIS at ES–3.

- The DMMP/EIS contains numerous tables and descriptions of anticipated dredging volumes, disposal, and other related work over the next 20 years. *See, e.g., id.* at 2–34, 2–35, 2–55.
- In its Response to Comments, the Corps stated that it "does not plan to prepare an Environmental Assessment or Supplemental EIS each time it dredges. However, the Corps may supplement the DMMP/EIS *if there are substantial changes in the plan or impacts.*" DMMP/EIS at O–128 (emphasis added).

These statements all demonstrate that at the time the Corps issued the ROD it adopted a twenty-year plan. In *Lujan* the Supreme Court found that a "land withdrawal review program" was not subject to judicial review because it was more like a " 'weapons procurement program' of the Department of the Defense or a 'drug interdiction program' of the Drug Enforcement Administration" than final agency action. *Lujan v. National Wildlife Fed.,* 497 U.S. at 890–91, 110 S.Ct. 3177. In contrast, the DMMP is sufficiently "fleshed out" to constitute final agency action. *See Mt. Adams Veneer Co. v. United States,* 896 F.2d 339, 343 (9th Cir.1989) (a "definitive statement of an agency's position" is one of the indicia of finality). Additionally, as Plaintiffs note, because the DMMP is a proposal for managing the Snake River navigation channel for twenty years, governing NEPA regulations would have barred division of the project into annual segments for purposes of environmental review because proposals "which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." (Reply at 5 n. 2 (quoting 40 C.F.R. § 1502.4(a))).

The "final agency action" at issue in this matter is the twenty-year DMMP/EIS, not merely the Corps' dredging plans for the winter of 2002–03.

**D. NWF's Likelihood of Prevailing on Claims Against the Corps.**

**1. Consideration of Reasonable Alternatives.**

NEPA requires that an EIS must consider the "alternatives to the proposed action." 42 U.S.C. § 433(2)(C)(iii), (E). Consideration of alternatives is "at the heart" of the EIS and "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. NEPA does not require an agency to consider all alternatives; rather, only "reasonable alternatives" need be "explore[d] and objectively evaluate[d]." 40 C.F.R. § 1502.14(a); *see also California v. Block,* 690 F.2d 753, 766 (9th Cir.1982) (judicial review of alternatives is governed by a "rule of reason"). "An agency's discussion of alternatives must be 'bounded by some notion of feasability.' " *Muckleshoot Indian Tribe v. United States Forest Serv.,* 177 F.3d 800, 814 (9th Cir.1999) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). What is reasonable or feasible is determined by reference to the purpose of the proposed action. *Citizens Against Burlington v. Busey,* 938 F.2d 190, 195–96 (D.C.Cir.1991).

The purpose of the DMMP/EIS is threefold:

1) To develop and evaluate alternative programs to maintain the authorized navigation channel and certain publicly owned facilities in the lower Snake

River and McNary reservoirs for the next 20 years;

2) To develop and evaluate alternative measures to maintain the flow conveyance of the Lower Granite reservoir for the remaining economic life of the project (through 2074); and

3) To develop and evaluate alternative programs of managing dredged material removed from these five reservoirs in a cost-effective, environmentally acceptable, and, whenever possible, beneficial manner.

DMMP/EIS at 1–2. Plaintiffs allege that the Corps failed to consider a range of reasonable alternatives that would meet or, in combination with other measures, would contribute to meeting the DMMP's stated purpose. Plaintiffs raise three alternatives that the National Wildlife Federation and other organizations described and urged the Corps to consider, and argue that the Corps did not adequately consider these alternatives. (Motion at 16–22). The Corps claims the three alternatives did not meet the project's stated purpose and need, and therefore the Corps was not required to set forth those alternatives in the DMMP/EIS. (Response at 28).

**a. The Sediment Control Alternative.**

Several agencies and organizations proposed consideration of strategies to reduce the heavy inflow of sediment into the Lower Granite pool by encouraging better upstream agricultural and forestry practices. *See, e.g.* DMMP/EIS O–1 (letter from United States Environmental Protection Agency expressing concern "that the plan does not include a strategy for reducing the input of sediment into the project area [and recommending] that the DMMP/EIS be revised to include a sediment reduction strategy as an integral component"); *see also id.* at O–2, 5, 7, 18, 21, 62, 65, 77 (same).

Defendants note that the sediment reduction strategies were considered in Section 2.2.1 of the DMMP/EIS, but that this alternative did not receive further consideration "because the Corps does not have the authority to regulate land uses and land management practices within the vast majority of the sediment contributing drainage basin." (Response at 30). Defendants further maintain that this option will not "address natural erosion or the immediate need for sediment management in the reservoirs." *Id.*

An agency may not reject a reasonable alternative because it is "not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(c); *see also Muckleshoot Indian Tribe,* 177 F.3d at 814. An agency's refusal to consider an alternative that would require some action beyond that of its congressional authorization is counter to NEPA's intent to provide options for both agencies and Congress. *See Natural Res. Def. Council v. Morton,* 458 F.2d 827, 836 (D.C.Cir.1972) ("The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decisionmakers in the legislative as well as the executive branch."). The Corps' argument that it did not fully consider the sediment reduction strategy due to a present lack of authority to implement such a strategy does not appear to be supported by the relevant NEPA regulations and caselaw.

The Corps' argument that sediment control strategies are not a complete solution to the "overall sedimentation problem" fails for similar reasons. An agency may not "disregard alternatives merely because they do not offer a complete solution to the problem." *NRDC v. Morton,* 458 F.2d at 836. The Corps

notes that the DMMP/EIS states that the LSMG will study sediment reduction options and that the "Corps plans to encourage participation from some of the land management and conservation agencies to specifically address sediment reduction strategies." (Response at 30). Further study by agencies and individuals other than the Corps and the Corps' "encouragement" of sediment reduction by such agencies and individuals is unlikely to constitute adequate consideration of a reasonable alternative.

While an agency need not "consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives," *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir.1996), the sediment reduction policy is not contrary to the DMMP's basic policy objectives so as to justify the Corps' apparently superficial consideration. The Corps' arguments that it does not have authority to implement fully sediment reduction strategies and that such strategies do not constitute a complete solution to the sediment problem do not relieve the agency of its duty to fully consider a reasonable alternative. The apparent lack of full consideration of the sediment control strategy therefore weighs in favor of a finding that Plaintiffs are likely to succeed on the merits.

**b. The Sediment Flushing Alternative.**

Several agencies and organizations proposed consideration of strategies to use partial, temporary reservoir drawdowns and increased flows to "flush" sediment downstream to both reduce ongoing buildup and scour existing accumulations. *See, e.g.,* DMMP/EIS at O–34 (letter from Washington Department of Fish and Wildlife providing detailed justification for utilizing flushing events to address sediment); *see also id.* at O–18, 21, 65 (same).

Defendants note that the sediment flushing strategy was considered in Section 2.2.1 of the DMMP/EIS, but that this alternative did not receive further consideration "because a drawdown of a magnitude that would be effective in flushing sediments downstream would cause adverse impacts to multiple project features with little assurance of success at achieving program purposes." (Response at 31). Specifically, the Corps contends that such flushing would be damaging to the reservoir's ecological environment. *Id.*

The potential for adverse impacts noted by the Corps is based upon a 1992 experimental reservoir drawdown of thirty-six feet. *See* DMMP/EIS at 2–6; Sands Decl. ¶¶ 41–42. Additionally, the Corps' fishery biologist, Paul Ocker, stated that whether a smaller drawdown would be sufficient is not known and therefore "the operation [would not be justified] without in-depth study and analysis." Ocker Decl. ¶ 35. Plaintiffs note that the drawdown proposed by other agencies, tribal groups, and conservation organizations is a "smaller and shorter 10–15 foot sediment flushing alternative." (Reply at 8 n. 5). Robert Heinith, the Hydro Program Coordinator for the Columbia River Inter–Tribal Fish Commission ("CRITFC") stated that such sediment flushing would benefit fish significantly. *See* Heinith Decl. ¶¶ 12–17. Plaintiffs contend that the "in-depth study and analysis" mentioned by Mr. Ocker is precisely the purpose of an EIS.

When an agency's scientific technical expertise is implicated, a court's deference to that agency is particularly important. *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993). This heightened deference favors the Corps regarding the sediment flushing alternative. However, the record before the Court provides little support for the proposition that the Corps adequately considered the proposed ten to fifteen foot draw-

down, as opposed to the much larger 1992 drawdown, or that conclusions based upon the 1992 drawdown reasonably could be applied to the smaller drawdown.[5] Given these conflicting factors, the Court cannot find that, based upon alleged failure to consider the sediment flushing strategy, Plaintiffs are likely to prevail on the merits. However, serious questions regarding the merits on this question are present.

**c. The Seasonal Light-Loading Alternative.**

Several organizations proposed consideration of strategies to restrict seasonally the largest, heaviest barges and use higher pool levels to reduce the need for dredging. *See, e.g.*, DMMP/EIS at O–77 (letter from the Nez Perce Tribe suggesting consideration of limiting navigation to periods of higher flows or to vessels with less draft); *see also id.* at O–108 (same). Plaintiffs urge that this alternative "would permit fully loaded barges during the non-fish migration season by increasing the levels of the reservoirs to maintain a full channel, and would require use of lighter loaded barges during the times of the year when the Corps is required to operate the pools near minimum operating pool ('MOP') for the benefit of migrating juveniles." (Motion at 6).

Defendants state that the seasonal light loading alternative "is in essence a plan to deliberately allow reductions in navigable capacity by failing to maintain the project as authorized by Congress." (Response at 31). The Corps asserts that it maintains the navigation channel to a congressionally authorized depth of fourteen feet and appears to assert that it must maintain the channel at that depth. *Id.* at 4. Defendants further argue that, contrary to Plaintiffs' assertion, the seasonal light loading alternative would prevent maintenance of the authorized depths for up to six months. *Id.* at 32. Plaintiffs maintain that Congress anticipated seasonal shutdowns of the navigation waterway and that the Corps admitted that a shallower thirteen-foot channel would produce no net economic change.[6] *Id.* at 9. Plaintiffs also note that, unlike the sediment reduction and sediment flushing alternatives, the seasonal light loading alternative did not receive preliminary consideration by the Corps. (Reply at 9).

Because light loading may be less compatible with the DMMP/EIS's stated purpose of "maintain[ing] the authorized navigation channel," the Corps' apparent failure to consider seasonal light loading is less egregious than the Corps' apparent failure to consider the sediment reduction strategy. However, the Court finds that serious questions regarding the merits of this question are present for the same reason that the Court finds that Plaintiffs are likely to succeed on the merits regarding the sediment reduction alternative. Even if the Corps were not presently empowered to maintain the channel at a depth of less than fourteen feet, it would not be permitted to disregard a reasonable alternative.[7] *NRDC v.*

5. Additionally, the Corps addressed the smaller drawdown only in the comments section of the DMMP/EIS and in the response to comments in the ROD. Placement of the discussion of the smaller drawdown alternative in a DMMP/EIS appendix may have violated the requirement that opposing views be reflected at the "appropriate point." 40 C.F.R. § 1502.9(b); *see also Friends of the Earth v. Hall,* 693 F.Supp. 904, 924 (W.D.Wash.1988) (holding that placement of agency criticisms of Corps plan in comments appendix was not the "appropriate point").

6. The additional shipping costs from light loading barges would be offset be the reduced dredging costs of maintaining a thirteen foot channel. *See* ROD Attach. A at 21.

7. The Court expresses no opinion regarding whether the Corps is authorized to maintain

*Morton,* 458 F.2d at 836. Similarly, if seasonal light loading would not provide a complete solution to the problem, but in concert with other strategies would be a reasonable alternative, the Corps should consider the strategy. *Id.*

**2. Economic Analysis.**

An agency must undertake a "reasoned evaluation of relevant factors" to ensure that its decision is informed. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992). An analysis that overstates the economic benefits of a project fails in its purpose of allowing decisionmakers to balance environmental harms against economic benefits. *Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 446–48 (4th Cir.1996). An EIS that relies upon misleading economic information may violate NEPA if the errors subvert NEPA's purpose of providing decisionmakers and the public an accurate assessment upon which to evaluate the proposed project. *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987). However, a reviewing court should not "fly speck" such elements of an EIS "and hold it insufficient on the basis of inconsequential, technical deficiencies." *Id.*

As part of the Corps' "reasoned evaluation of relevant factors," the Corps prepared a cost-benefit analysis of the alternatives. The Corps concluded that the DMMP has a benefit-to-cost ratio of 16:1. DMMP/EIS at 1–2; ROD at 20. Plaintiffs urge that the Corps' economic analysis vastly overstates the benefit-to-cost ratio for several reasons. Plaintiffs' most significant complaint is that the economic analysis does not include the capital and environmental costs of construction of the dams, but does claim ongoing benefits of that construction. (Motion at 26). Under Plaintiffs' revised calculation, which accounts for these costs, the benefit-to-cost ratio is .71:1 (*i.e.,* every dollar spent on the navigation system produces 71 cents of benefits). *Id.* Defendants argue that the economic analysis was prepared using the Water Resource Council's "Economic and Environmental Principles and Guidelines for Water and Related Land Resource Implementation Studies." (Response at 33). With respect to Plaintiffs' argument that the economic analysis should take into account the navigation waterway's share of the dam and lock construction costs, the Corps notes that the majority of these costs were expended over a quarter century ago and that such "sunk costs" should not be considered in an engineering economic analysis. *Id.* The sunk costs considered by Plaintiffs will exist whether the DMMP is or is not implemented, and therefore should not affect the decision regarding dredging. *Id.* Plaintiffs' expert, Anthony Jones, argues that because the navigation channel and hydroelectric power dams are still producing a "benefit stream," their costs of construction are not truly "sunk." (Jones Reply Decl. ¶¶ 12–13). Jones also notes that at times the Corps treats such costs as "sunk" and at other times declines to treat such costs as "sunk." *Id.* ¶ 17 ("While the costs related to the power portions of the dams is analyzed by the agency as afloat, the navigation related capital cost are [sic] considered to be sunk.").

For purposes of the present motion the Court need not resolve this conflict. Plaintiffs have presented evidence that had the costs and benefits of the navigation channel been presented accurately prior to its construction, the benefits may not have outweighed the costs. Plaintiffs contribute additional voices to the growing chorus that construction of the subject hydroelectric dams was a bad poli-

the navigation channel at a depth of less than fourteen feet.

cy choice.[8] *See, e.g.,* Karen Richardson & Jennifer Bello, *Current Plans to Ameliorate the Depletion of the Snake River Salmon: Old Controversy or New Solution?,* 12 Vill. Envtl. L.J. 65 (2001); Michael C. Blumm, *et. al, Saving Snake River Water and Salmon Simultaneously: The Biological, Economic, and Legal Case for Breaching the Lower Snake River Dams, Lowering John Day Reservoir, and Restoring Natural River Flows,* 28 Envtl. L. 997 (1998). However, for purposes of this matter, the Court accepts their existence. Although Plaintiffs advance a credible argument that the construction costs should be considered in the DMMP/EIS economic analysis, a court must "defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor." *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993). The Court therefore defers to the Corps regarding consideration of the navigation channel's construction costs.

Plaintiffs also claim that the economic analysis is misleading and incomplete because it relies on overstated freight benefits, it improperly assumes that if the dredging does not occur all navigation will cease immediately rather than gradually diminishing over time, and it fails to account properly for environmental costs. (Motion at 25–26). Plaintiffs maintain that these errors overstate the benefits of the dredging program by 45%. *Id.* at 26 (citing Jones Decl. ¶ 57). Defendants argue that the commodity shipment forecasts that Plaintiffs suggested it consider remain in draft form and that it utilized the best available data. (Response at 34). Defendants appear to concede that their assumption that if the dredging does not occur all navigation will cease immediately is incorrect. Defendants insist that the environmental costs of the maintenance dredging were considered in the economic analysis. (Response at 34 (citing DMMP/EIS App. C, Attach. E)).

Although an EIS economic analysis that overstates benefits, but which continues to demonstrate a favorable benefit-to-cost ratio may constitute grounds for rejecting the EIS, *see Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 447 (4th Cir.1996), given the high degree of deference a court must grant an agency with respect to methodologies employed, the Court finds that Plaintiffs have not demonstrated a high probability of success on the merits or serious questions regarding the merits of Plaintiffs' challenge to the DMMP/EIS economic analysis.

**E. NWF's Likelihood of Prevailing on Claim Against NMFS.**

Pursuant to the ESA, NMFS issued a biological opinion (the "BiOp") regarding the impacts of the DMMP on the critical habitat of protected Snake River salmonids. *See* Hasselman Decl. Exh. 11. The BiOp concluded that the DMMP will not jeopardize or adversely modify that critical habitat. BiOp at 36–37. Additionally, NMFS issued an incidental take statement that permits the Corps to "take" listed salmon and steelhead species. *See* 50 C.F.R. § 402.14(i). As with judicial review of the Corps' actions, the "arbitrary, capricious, ... abuse of discretion, or otherwise not in accordance with law" standard applies to review of biological opinions. *Bennett v. Spear,* 520 U.S. 154, 178–79, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

8. The Court is neither empowered to evaluate that policy decision nor does it express an opinion regarding that policy decision in this Order.

1. **Destruction or Adverse Modification of Critical Habitat.**

A biological opinion must ensure that agency action: (1) is not likely to jeopardize the continued existence of an endangered species in the wild; and (2) will not result in the destruction or adverse modification of a species' critical habitat. 16 U.S.C. § 1536(a)(2) (ESA 7(a)(2)). "Adverse modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." 50 C.F.R. § 402.02. The Snake River Fall Chinook spawn in the Snake River and require particular substrate for successful spawning. Portions of the Lower Snake River are designated as critical habitat for the Snake River Fall Chinook. 58 Fed. Reg. 68,543, 68,545 (Dec. 28, 1993). Snake River Fall Chinook spawning has been documented near the lock entrances of the Snake River dams. (BiOp at 31).

Plaintiffs allege that the planned dredging will occur in areas in which the Snake River Fall Chinook have spawned. (Motion at 30); *see also* BiOp at 38–39 ("[G]ravels and cobbles in areas (near and within navigation lock entrances) where SRF chinook have spawned in some years [will be removed]. This action may modify site conditions to the point that SRF chinook no longer spawn in these areas."). Despite these findings, NMFS determined that the dredging will not result in the "destruction or adverse modification" of critical habitat. Plaintiffs maintain that this conclusion is both arbitrary and contrary to law "because NMFS has failed to provide any credible scientific basis or rational analysis to support its conclusion that elimination of this critical habitat" does not constitute adverse modification of the critical habitat. (Motion at 31–32).

Defendants state that "[t]he work for 2002–03 does not involve dredging of any documented spawning habitat." (Response at 37). However, the Court has rejected the argument that the only action subject to review is the 2002–03 component of the DMMP. *See* Section III.C, *supra.* Defendants admit that the "20-year DMMP encompasses some dredging of the tailraces, *where spawning has been documented,*" but maintain that "no such work will be authorized for implementation until [NMFS] has consulted with the Corps thereon." [9] (Response at 37 (emphasis added)).

Defendants' focus on the presence of the Snake River Fall Chinook, rather than the potential for the actions to adversely modify a critical habitat, is improper. This is revealed by NMFS' prior rejection of a suggestion that it designate habitat as "critical" only during the times of the year when the fish are present because "actions with long-term impacts on habitat features could adversely affect the species even though taken while the species is not present." 58 Fed.Reg. 68543, 68549 (Dec. 28, 1993). The absence of a species from its critical habitat should not provide a basis for the determination that adverse modification is permissible. Further degradation of that habitat only makes the species' return less likely. NMFS admitted that "[d]redging of these sites is likely to reduce their suitability as spawning habitat and in turn, the amount of spawning that will occur in these areas." BiOp at 31. Due to NMFS' failure to explain how

9. Plaintiffs note that the Corps is the only agency with authority to implement ESA § 7(a) consultation and has only stated that it will "coordinate" with NMFS before undertaking further dredging. (Reply at 11 n. 7 (citing DMMP/EIS at O–128)).

dredging in the Snake River Fall Chinook's critical habitat will not adversely modify that habitat, its action appears to be arbitrary and capricious. Plaintiffs are likely to succeed on the merits of their claim that the BiOp fails to ensure that the DMMP will not result in the destruction or adverse modification of the Snake River Fall Chinook's critical habitat.

**2. The NMFS Incidental Take Statement.**

The ESA requires NMFS to establish the "amount or extent" of protected species members that may be incidentally taken (*i.e.,* killed or injured) as a result of the DMMP project by (1) establishing a specific numeric value for the take, or (2) if NMFS shows that establishment of a specific numeric value cannot be "practically obtained," the agency may describe surrogate conditions "so long as these conditions are linked to the take of the protected species." *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,* 273 F.3d 1229, 1249–50 (9th Cir. 2001). To utilize such a surrogate the agency must establish "an articulated, rational connection between [the surrogate] and the taking of species." *Id.* at 1251.

Plaintiffs argue that the incidental take statement ("ITS") issued by NMFS is insufficient because NMFS did not identify a specific numerical "take" of the species, did not explain why establishment of a specific numerical take could not be attained practically, and did not provide a rational surrogate for the take. (Motion at 33). Setting aside the first two arguments, the Court considers whether the NMFS take surrogate is sufficient. Rather than establishing a numerical take, NMFS utilized a surrogate that, in effect, amounts to the project's required work conditions. *See* BiOp at 41. Defendants claim that such a surrogate is appropriate because NMFS "found it more logical to establish parameters that would make take unlikely to occur in the first instance" than to establish a specific take limit or identify another surrogate. (Response at 40 (citing Bambrick Decl. ¶ 24)). This surrogate appears to be insufficient for the reasons described by Plaintiffs.

Most importantly, the purpose of establishing a permissible take in an ITS is to ensure that even if the project is implemented in strict accordance with the plan, it will not result in a level of harm to the protected species that would cause the agency to reconsider its jeopardy determination. *Arizona Cattle Growers',* 273 F.3d at 1249 (ITS sets a " 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of ESA protection], and requiring the parties to re-initiate consultation"). An ITS cannot be effective in its purpose if there is no such "trigger" to require the agency to reconsider its approval of the incidental take.

Second, Defendants' argument requires an interpretation of ESA regulations that is inconsistent with a fundamental principle of statutory interpretation. NMFS must (1) specify the amount or extent of the incidental take; (2) identify "reasonable and prudent measures" necessary to "minimize such impact;" and, (3) set forth the "terms and conditions" required to implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i)(1)(i)-(iv). If the NMFS-approved work conditions simultaneously could satisfy both the "minimization of impact" requirement and the "amount or extent" of take requirement, one or both of those regulatory requirements impermissibly would be rendered meaningless. *Cf. United States v. Mohrbacher,* 182 F.3d 1041, 1050 (9th Cir.1999).

For the foregoing reasons the Court finds that plaintiffs are likely to succeed on the merits of their claim that NMFS is-

sued an invalid incidental take statement pursuant to the ESA.

**F. Balance of Irreparable Harm and Public Interest.**

The Court finds that Plaintiffs have established a likelihood of success on the merits for certain claims and serious questions as to the merits on other claims. *See* Sections III.D–E, *supra.* For preliminary injunctive relief to be appropriate, Plaintiffs must also establish the possibility of irreparable injury (when success on the merits is probable) or that the balance of hardships tip sharply in their favor (when serious questions regarding the merits exist). *Fund for Animals,* 962 F.2d at 1400.

Although the failure of a government agency to evaluate thoroughly the environmental impact of a proposed action does not create a presumption of irreparable harm, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). "Consequently, when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1195 (9th Cir.1988) (quoting *Amoco,* 480 U.S. at 545, 107 S.Ct. 1396).

Plaintiffs have established that if the 2002–03 dredging proceeds there is a risk that active spawning redds of the Snake River Fall Chinook could be disturbed. *See* Heinith Reply Decl. ¶¶ 6–12. Even NMFS employee Forrest Bambrick acknowledges that there is a risk that spawning redds may be undetected before the winter 2002–03 dredging begins. *See* Bambrick Decl. ¶ 9 ("It is possible that some redds will go undetected in the vicinity of the dredging operations."). Additionally, Plaintiffs have established with a higher degree of certainty that dredging will adversely modify Snake River Fall Chinook critical habitat. *See* Section III. E.1, *supra.*

At oral argument Defendants suggested that if a preliminary injunction were appropriate in these circumstances, no activity could ever take place in a protected species' critical habitat. This assertion is incorrect. A biological opinion must certify that agency action "will not result in the destruction or adverse modification of a species' critical habitat." 16 U.S.C. § 1536(a)(2) (ESA 7(a)(2)). The Court does not suggest that the Corps may not undertake any activities in the critical habitat at issue here. For example, actions that would produce a *de minimis* adverse effect are likely not prohibited. Rather, the Court finds that the BiOp appears to have failed to explain how dredging in a critical habitat does not result in destruction or adverse modification of that habitat and that Plaintiffs have established that such dredging is likely to adversely modify the critical habitat.

The apparent deficiencies in the ITS contribute to this finding of likely irreparable harm. The parties agree that "take" of an endangered species is permissible under the ESA. However, the apparent failure of NMFS to establish a permissible "take" or a reasonable surrogate for such "take" eliminates a critical check against action that would harm the Snake River Fall Chinook species should implementation of the DMMP kill or injure more than an acceptable number of protected salmon. Plaintiffs have established that there exists at least a "possibility" that these harms will occur. Such harms satisfy the "irreparable injury" requirement.

Defendants and the Navigation Coalition assert that various harms will

occur if a preliminary injunction is issued. *See, e.g.*, Response at 24–25 (asserting that a delay in dredging will cost the government $10,000 per day in standby costs and directing the contractor to demobilize could cost up to $800,000) (citing Sands Decl. ¶ 35). These harms are economic, and therefore not irreparable. *Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir.1986) ("more than pecuniary harm must be demonstrated" to prevent issuance of injunctive relief). Based upon the evidence submitted by the Navigation Coalition, the Court recognizes that businesses and employees in Washington, Oregon, and Idaho that rely upon the navigation channel may suffer economic hardship if it is not maintained. This is a serious concern. Although economic injuries are often characterized as not irreparable, *see id.*, a company's lost profit often results in a lost job. The profound consequences of such losses on individuals, families and communities are well known. The Court therefore seriously considers these harms when determining the balance of hardships. *See Amoco Prod. Co.*, 480 U.S. at 545, 107 S.Ct. 1396 (considering $70 million economic loss). However, balancing the hardships alleged by Defendants and the Navigation Coalition against the strong probability of irreparable environmental injury, the Court finds that the balance of hardships favors Plaintiffs. *See National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir.2001) (finding that loss of anticipated revenues does not outweigh "potential irreparable damage to the environment").

Defendants also assert that the public interest weighs against issuance of a preliminary injunction. Defendants urge that the public interest favors maintenance of the navigation channel for national security, economic, and environmental reasons. *See* Response at 26. The Court recognizes that these are valid public interest concerns.[10] However, in the context of a preliminary injunction motion a reviewing court is not bound by the agency's assessment of the public interest, but rather conducts an independent analysis of the public interest. *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983). The Court recognizes that the Endangered Species Act evinces a congressional declaration that protection of endangered species is in the public interest. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987). Additionally, as the great Judge William L. Dwyer indicated, ensuring that government agencies comply with the law is a public interest of the "highest order." *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081, 1096 (W.D.Wash.1991). Therefore the Court finds that the public interest weighs in favor of issuance of the preliminary injunction.

**G. Conclusion Regarding Issuance of Preliminary Injunction.**

At oral argument Defendants' counsel suggested that Plaintiffs are asking the Court to substitute the Court's own judgment for that of the Corps and NMFS. Such "second guessing" of agency action is impermissible. *See Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. However, in finding that Plaintiffs have established a likelihood of success on the merits for certain claims and serious questions as to the merits for other claims, *see* Sections III.D–E, *supra*, the Court does not substitute its judgment for that of the agencies. Rather, the Court finds that the arguments the Corps ad-

10. Defendants assert that maintenance of the navigation channel is in the public interest for environmental reasons because barges are used to carry juvenile salmon down the Snake and Columbia River. As Plaintiffs note, such concern may be addressed by light loading such barges.

vanced for not considering the sediment reduction, sediment flushing, and seasonal light loading strategies (such as failure to provide a complete solution to the problem and the Corps' lack of statutory authority), appear to be insufficient legally. Similarly, the Court finds that the failure of NMFS to explain why dredging of Snake River Fall Chinook critical habitat will not destroy or adversely impact that critical habitat and the failure of NMFS to produce an adequate incidental take statement likely renders the agency action invalid. *See* BiOp at 36, 40–41.

The Court also finds that Plaintiffs have established the possibility of irreparable harm, that the economic harms alleged by Defendants and the Navigation Coalition are important but do not outweigh the possibility of irreparable environmental harm, and that the public interest weighs in favor of issuance of an injunction. *See* Section III.F, *supra.*

For the foregoing reasons the Court issues a preliminary injunction enjoining (1) the Corps from initiating dredging or disposal activities in the lower Snake River as set forth in the DMMP/EIS and ROD until such time as the Court has ruled on the merits of Plaintiffs' claims, and (2) NMFS from authorizing incidental take of ESA-listed species for the DMMP project until such time as the Court has ruled on the merits of Plaintiffs' claims.

## IV. CONCLUSION

Plaintiffs' motion for a preliminary injunction (Dkt.# 2) is GRANTED. The Clerk of the Court is directed to send copies of this Order to all counsel of record.