**IDAHO RIVERS UNITED,
et al., Plaintiffs,**

v.

**UNITED STATES ARMY CORPS
OF ENGINEERS, Defendant.**

**CASE NO. C14–1800JLR**

United States District Court,
W.D. Washington,
at Seattle.

Signed January 7, 2015

---

Matthew R. Baca, Stephen D. Mashuda, Earthjustice Legal Defense Fund, Rob Roy Smith, Kilpatrick Townsend & Stockton LLP, Seattle, WA, David J. Cummings, Office of Legal Counsel, Michael A. Lopez, Nez Perce Tribe, Office Of Legal Counsel, Lapwai, ID, for Plaintiffs.

Kent E. Hanson, Kristofor Swanson, US Department of Justice, Washington, DC, for Defendant.

Beth S. Ginsberg, Jason T. Morgan, Sara A. Leverette, Stoel Rives, Seattle, WA, for Inland Port and Navigation Group.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

JAMES L. ROBART, United States District Judge

## I. INTRODUCTION

This matter comes before the court on Plaintiffs Idaho Rivers United, Washing-

ton Wildlife Federation, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Sierra Club, Friends of the Clearwater, and Nez Perce Tribe's (collectively "Plaintiffs") motion for preliminary injunction to halt Defendant United States Army Corps of Engineers' ("the Corps") plan to conduct dredging operations on the lower Snake River beginning in January, 2015. (*See generally* Mot. (Dkt.# 8).) Plaintiffs' lawsuit and motion for a preliminary injunction are based on the Corps' alleged violations of both the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and the Clean Water Act (CWA"), 33 U.S.C. §§ 1251–1387. (Mot. at 1; Compl. (Dkt.# 1) ¶ 1.)

In their complaint, Plaintiffs challenge two actions by the Corps: "1) the Corps' 'immediate need' proposed dredging action for the winter of 2014–2015; and 2) the Corps' long-term plan for addressing sediment accumulation in the Snake River from Lewiston, Idaho to the confluence with the Columbia River." (Compl.¶ 6.) This order is not a final determination of the issues in this case. This order addresses only the propriety of granting the extraordinary relief of a preliminary injunction with respect to the Corps' "immediate need" proposed dredging of portions of the lower Snake River.

The parties have fully briefed the issues (*see generally* Mot.; Resp. (Dkt.# 31); Reply (Dkt.# 55)) and provided myriad declarations in support of their positions. In addition, the court granted unopposed motions to intervene on behalf of the Inland Ports and Navigation Group ("IPNG") and the Columbia Snake River Irrigators Association ("CSRIA") (*see* Dkt. # # 28, 29), and these intervenors filed memoranda in

opposition to Plaintiffs' motion (*see* IPNG Resp. (Dkt.# 37); CSRIA Resp. (Dkt.# 47)), along with their own evidentiary materials. On January 5, 2015, the court heard the argument of counsel, and being fully advised by the parties and intervenors, rendered an oral decision denying Plaintiffs' motion. This written order now confirms the court's earlier oral ruling and provides the parties with a more complete analysis of the court's decision.

## II. BACKGROUND

### A. Prior Conflict Over the Corps' Dredging of Portions of the Lower Snake River

As a part of its Congressional authorization, the Corps operates and maintains the navigation system on the lower Snake River. (Swanson Decl. (Dkt.# 36) Ex. 1 ("EIS") at 1–1.)[1] Between 1961 and 1975, the Corps constructed four dams on the Snake River in Washington State, including Ice Harbor, Lower Monumental, Little Goose, and Lower Granite. (*Id.*) In addition to navigation, these four dams and their associated locks and reservoirs serve purposes of power generation, recreation, fish and wildlife conservation, and incidental water supply for irrigation. (*Id.* at 1–6, 1–7.) The Corps collectively refers to these as the Lower Snake River Projects ("LSRP"). (*Id.* at 1–1; Vail Decl. ¶ 2.) The Corps has historically used dredging as its primary method of removing accumulated sediment that interferes with commercial navigation or other Corps' projects on the lower Snake River. (EIS at 1–1.)

Conflict over dredging on the lower Snake River has a long history in this

---

1. Citations to "EIS" or "EIS App." throughout this order refer to the Lower Snake River Programmatic Sediment Management Plan Final Environmental Impact Statement or its appendices, which are attached as Exhibit 1 to the declaration of Kristofor R. Swanson and found at docket numbers 36–1, 36–2, 36–3. (*See* Swanson Decl. Ex. 1.)

district. In 2002, the Corps prepared a Dredged Material Management Plan to evaluate alternatives for managing disposal of any future sediment the Corps might dredge from the lower Snake River. (*See id.* at 1–3.) A group of organizations, including Plaintiffs, challenged the Corps' dredging plan, and the Honorable Robert S. Lasnik of this district preliminarily enjoined the dredging. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 235 F.Supp.2d 1143, 1162–63 (W.D.Wash.2002).

After Judge Lasnik issued a second preliminary injunction against the Corps' planned dredging on November 1, 2004 (*see* Compl. Ex. 1), the parties agreed to settle their dispute in 2005 (*see id.* Ex. 2 (attaching settlement agreement and joint motion to dismiss).) As part of the settlement, the plaintiffs agreed not to bring any further challenges to the Corps' planned maintenance dredging for the winter of 2005–2006,[2] and the Corps agreed to conduct review under NEPA for a long-term approach to sediment management in the lower Snake River, which the parties referred to as the Programmatic Sediment Management Plan, ("PSMP"). (*See id.*) The Corps also agreed to issue a final environmental impact statement and record of decision with respect to the PSMP in late 2009. (*See id.*)

The Corps did not meet the deadlines outlined in the 2005 settlement agreement. Indeed, instead of issuing its final environmental impact statement and record of decision in 2009 as agreed, the Corps did not complete those tasks until late 2014—nearly five years past the date delineated in the parties' agreement. On November 17 and 18, 2014, the Corps issued its Final Environmental Impact Statement ("FEIS") and Records of Decision ("RODs") for the PSMP and for its "current immediate need action" to dredge specific locations in the lower Snake River beginning December 15, 2014.[3] (*See* Compl. ¶ 1.) Since that time, the Corps has informed the court that any immediate need dredging will not commence before approximately January 12, 2015. (*See* Resp. (Dkt.# 31) at 5 (citing Vail Decl. (Dkt.# 32) ¶ 10).)[4]

In their complaint, Plaintiffs challenge both the Corps' long-term PSMP and the Corps' "current immediate need action" to dredge specific locations in the Lower Snake River beginning in January 2015. (*See* Compl. ¶¶ 6–11.) Plaintiffs' motion for preliminary injunction, however, addresses only the Corps' immediate plan to conduct dredging operations in January 2015. (*See generally* Mot.)

**B. The PSMP**

The PSMP was intended to create a decision-making framework through which sediment accumulation interfering with purposes of the existing LSRP (including,

**2.** The dredging that the plaintiffs agreed to as part of the settlement and that the Corps' ultimately conducted in the winter of 2005–2006 is similar to the dredging the Corps plans to conduct this winter at the confluence of the Snake and Clearwater rivers and on the downstream side of the Ice Harbor Dam's navigation lock. (*Compare* Resp. at 4 (citing EIS at 2–3, 3–94; EIS App. L at L–4 to L–7) *with* Compl. Ex. 1 at 4 (stating that the Corps plans to dredge in the navigation channel at the confluence of the Snake and Clearwater Rivers, the Ports of Lewiston, Idaho, and Clarkston, Washington, and the navigational

lock approaches at the Lower Granite Dam and Lower Monumental Dam) *and* Compl. Ex. 2 ¶ 1.)

**3.** Plaintiffs allege that the Corps released the RODs first on November 17, 2014, and then released a new version of the RODs with unspecified corrections on November 18, 2014. (*See* Compl. ¶¶ 1, 3.)

**4.** The Corps has indicated that if necessary it would instruct its contractor not to begin dredging prior to January 10, 2015. (Vail Decl. ¶ 10.)

but not limited to, navigation) could be managed and, to the extent possible, prevented. (EIS at 1–4.) The Corps conducted studies to analyze sediment sources, movement through the river system, and deposits in the lower Snake River reservoirs. (EIS at 1–18 to 1–28; EIS App. M at M–9 to M–36, M–95 to M–108.)

The Corps identified 24 potential sediment management measures across four different categories. (EIS at 2–4 to 2–9.) The Corps created six management frameworks, as well as a no-action alternative, and analyzed these frameworks in its EIS. (EIS at 2–27 to 2–41.) The Corps selected "Alternative 7" as its PSMP. (Mashuda Decl. (Dkt.# 11) Ex. 21 (Dkt.# 14–5) (attaching the Corps' ROD for the PSMP) at 11 ("Alternative 7 is the selected plan.").) The Corps' ROD describes Alternative 7 as providing for a range of dredging, system management, and structural management measures for the Corps to use to address sediments that interfere with the various purposes of the Lower Snake River Projects. (*Id.* at 1.) The Plan includes fourteen potential management measures to address sediment accumulation, including dredging. (EIS at 2–29 to 2–30 (chart), 2–36 to 2–37.) The Corps developed these various management measures to address problematic sediment accumulation on both an immediate and near-term basis, as well as to address "anticipated future problems before they are critical." (*Id.* at 2–4; EIS App. A at A–1.)

The PSMP identifies certain conditions under each of the Corps' management purposes that, when met, will trigger either "immediate" or "future forecast" action from the available management measures. (EIS App. at A–19 to A–30.) For naviga-

tion, Corps action is triggered when a portion of the navigation channel is less than fourteen feet at Minimum Operating Pool[5] due to sediment accumulation and impairs the safe commercial navigation or access to navigation locks ("immediate need"), or when that scenario is forecasted to occur more than once in a five-year period ("future forecast need"). (*Id.* at A–21 to A22.) The PSMP then identifies the specific management measures the Corps should consider to remedy an immediate or forecasted sediment problem. (*See, e.g., id.* at A–23 to A–24.)

## C. The Current Immediate Need Action

In developing the PSMP, the Corps identified two locations on the lower Snake River where sedimentation in the navigation channel had lowered water depth to as low as seven and nine feet, thereby impairing navigation and triggering an immediate need action. (Mashuda Decl. Ex. 22 (Dkt.# 14–6) (attaching the Corps' ROD for current immediate need action) at 2.) The first impairment is at the downstream lock approach at Ice Harbor Dam (EIS at 2–3; EIS App. L at L–4, L–5 (maps)), and the second is at the confluence of the Snake and Clearwater rivers (EIS at 2–3; 3–94; EIS App. L at L–6 to L7). The Corps analyzed the need and potential for site-specific immediate action alongside the plan-level descriptions in the PSMP and issued a single final environmental impact statement with respect to both the PSMP and the current immediate need action. (EIS at 1–2.) Plaintiffs' motion for preliminary injunction is not about the entire PSMP or the entire 140–mile channel, but rather the Corps' proposed dredging activ-

---

5. Specific elevation operating ranges (from sea level) are authorized for the reservoirs behind each dam on the lower Snake River. (*See* Vail Decl. ¶ 2.) For example, the operating range for the Lower Granite Reservoir is 733 to 738 feet above sea level. (*Id.*) The lower end of the elevation range is known as the "Minimum Operating Pool" or "MOP." (Resp. at 3, n.2.)

ity at two locations on the lower Snake River to resolve the current navigation impairments. (*See generally* Mot.)

On November 14, 2014, the Corps decided to take action this winter and conduct dredging operations on the lower Snake River to address the navigational impairments at the Ice Harbor Dam and the Clearwater–Snake confluence and to reestablish the federal navigation channel to congressionally authorized dimensions. (Mashuda Decl. Ex. 22 at 1; EIS at 1–4.) The Corps based its objective on Congress's authorization for the navigation channel: "[T]he Columbia–Snake River barge navigation project shall be established as fourteen feet and two hundred and fifty feet, respectively, at minimum regulated flow." Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, 1193 (1962); (*see* EIS at 1–8 to 109; EIS App. G at G–84.)

An in-water work window from December 15 to March 1, when salmonids are less likely to be present, drives the timing of the Corps' planned dredging. (*Id.* at 5–7; EIS App. L at L–2.) The Corps plans to load the sediment onto a barge and use it to create thirteen acres of shallow-water habitat for juvenile salmonids at Knoxway Canyon, which is 23 river miles downstream from the confluence of the Clearwater–Snake confluence. (EIS at 2, 5–6; EIS App. L at L–16; Shelin Decl. (Dkt.# 34) ¶¶ 10–12.)

### D. Plaintiffs' Challenges to the Corps' Planned Dredging

Plaintiffs raise a variety of challenges to the Corps' planned "current immediate need action" to dredge portions of the lower Snake River this winter. (*See generally* Mot.) First, Plaintiffs assert that the

Corps provided only a truncated analysis in the EIS for its "current immediate need action" for dredging and failed to consider the full range of alternatives as required by NEPA. (*Id.* at 3 (citing EIS at 1–7); *id.* at 8–10.) Plaintiffs point out that the Corps' entire discussion of alternatives to reestablish the navigation channel to a depth of 14 feet consists of only two pages of text and presents only two alternatives: dredging or continuing the status quo and not dredging. (EIS at 2–41 to 244.) Plaintiffs argue that the Corps concluded that dredging was required without even listing, let alone considering, any other sediment management measure or combination of measures, such as reservoir draw-down to flush sediments, construction of bendway weirs, sediment agitation, or seasonal light-loading of barges. (Mot. at 5 (citing EIS at 218 to 2–20).) Instead, the Corps simply stated: "Other structural and management measures under Alternative 7 would not effectively address sediment that has already accumulated in the navigation channel." [6] (EIS at 2–42.)

Plaintiffs also argue that the Corps committed a variety of other statutory violations. Plaintiffs assert that the Corps violated NEPA by failing to take a hard look in its EIS at the impacts that the Corps' immediate action dredging would have on the Pacific lamprey. (*Id.* at 10–13.) Plaintiffs argue that the Corps violated NEPA by failing to take a hard look at reasonably foreseeable future conditions in the lower Snake River created by climate change and the effects of those future conditions will have on sedimentation. (*Id.* at 13–14.) Plaintiffs also assert that the Corps violated NEPA by relying upon a fundamentally flawed economic analysis concerning the value of maintaining the navigation chan-

---

**6.** Plaintiffs also challenge the Corps' position that it must maintain a 14–foot navigation channel as a misinterpretation to the Flood Control Act of 1962. (Mot. at 6.) Plaintiffs

assert that the Act merely authorizes the Corps to maintain a 14–foot channel, but does not require it. (*Id.* at 7–8.)

nel on the Snake River. (*Id.* at 14–20.) Finally, Plaintiffs maintain that the Corps violated the CWA by failing to complete a public interest analysis before deciding to proceed with its "immediate need" dredging this winter. (*Id.* at 21–22.)

### E. Procedural History of the Current Litigation

Plaintiffs filed their complaint for declaratory and injunctive relief on November 24, 2014. (*See* Compl.) On November 26, 2014, Plaintiffs filed the present motion seeking to preliminarily enjoin the Corps' current immediate need action of dredging on the lower Snake River. (*See generally* Mot.)

On November 26, 2014, IPNG moved to intervene in the action. (IPNG Mot. (Dkt.# 15).) On November 28, 2014, CSRIA moved to intervene as well. (CSRIA Mot. (Dkt.# 18).) Plaintiffs raised no opposition to these motions. (*See generally* Dkt.; *see also* Plfs. Resp. to CSRIA Mot. (Dkt.# 25).) On December 2, 2014, the court granted both motions to intervene. (*See* Orders (Dkt.# # 28, 29).)

On December 15, 2014, Defendants and Interveners filed memoranda in opposition to Plaintiffs' motion. (*See* Resp.; IPNG Resp.; CSRIA Resp.) On December 19, 2014, Plaintiffs filed a consolidated reply memorandum to Defendants' and Interveners' memoranda. (Reply (Dkt.# 55).) On January 5, 2015, the court heard the oral argument of counsel and issued an oral ruling denying Plaintiffs' motion. (Min. Entry (Dkt.# 56).) The court now provides its written analysis of Plaintiffs' motion below and reconfirms that a preliminary injunction should not issue.

### III. ANALYSIS

#### A. Preliminary Injunction Standard

■■■ "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the mov-

ant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (italics in original); *see also Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir.2012). To obtain a preliminary injunction, the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

■■■ The Ninth Circuit held that its "serious questions" version of the sliding scale test for preliminary injunctions remains viable after *Winter,* and this court may still apply that test. *Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134–35 (9th Cir.2011). In so ruling, the Ninth Circuit formulated the test as follows:

> ...[S]erious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.

*Id.* at 1135. "Serious questions" are those that are "substantial, difficult and doubtful, requiring a more thorough investigation." *Rep. of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988).

■■■ Under either the four-part test in *Winter* or the sliding scale test formulated in *Cottrell,* Plaintiffs are required to demonstrate a likelihood of irreparable harm. *Cottrell,* 632 F.3d at 1135; *Winter,* 555 U.S. at 24, 129 S.Ct. 365. It is this element of both tests that the court finds is central to its analysis here. Using a legal standard that the Supreme Court has since

overruled, this court previously found that Plaintiffs were entitled to injunctive relief because they had shown a "possibility" of irreparable harm to threatened or endangered salmon or their habitat. *See Nat'l Wildlife Fed'n*, 235 F.Supp.2d at 1161 (finding that plaintiffs "established that there exists at least a 'possibility' that these harms will occur"); *Nat'l Wildlife Fed'n v. Nat'l Fisheries Serv.*, No. C02–2259L, Dkt. # 107 at 25 (W.D.Wash. Nov. 1, 2004) (applying the "possibility of irreparable injury" standard); (*see also* Compl. Ex. 1 at 25). The Supreme Court subsequently rejected the "possibility" standard, *Winter*, 555 U.S. at 22–23, 129 S.Ct. 365, and the Ninth Circuit has confirmed that "plaintiffs must establish that irreparable harm is likely, not just possible," *Cottrell*, 632 F.3d at 1131. Thus, this court's prior analysis concerning the appropriateness of issuing a preliminary injunction against the Corps' planned dredging on the lower Snake River, even if factually similar, is of limited value today.

 The requirement of proving the likelihood of irreparable harm is equally applicable where the alleged harms are environmental in nature. *See, e.g., Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir.2010) (alleged harm to woodpecker habitat from logging "at most, showed such a possibility, but no likelihood of irreparable harm"). The Ninth Circuit, however, has stated that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable," and that "[i]f such injury is sufficiently likely, ... the balance of the harms will usually favor the issuance of an injunction to protect the

environment." *Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir.2009) (citation omitted). Nevertheless, the Ninth Circuit has expressly "declined to adopt a rule that *any* potential environmental injury *automatically* merits an injunction." *Carlton*, 626 F.3d at 474 (italics in original; citations and internal quotation marks omitted). Further, the Supreme Court recently cautioned that NEPA does not place a "thumb on the scales" in favor of issuing an injunction.[7] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). Thus, in evaluating the Corps' planned dredging activities on the lower Snake River, the court adheres to the Supreme Court's and the Ninth Circuit's precondition that Plaintiffs must demonstrate a likelihood of irreparable harm to warrant a preliminary injunction.

**B. Likelihood of Irreparable Harm**

 The bulk of Plaintiffs' arguments concerning the likelihood of irreparable harm relate to how the Corps' planned winter dredging will affect the Pacific lamprey and, in turn, how those effects will impact the Nez Perce Tribe. (*See* Mot. at 22–23.) Based on the declaration of Mr. Josiah B. Pinkham, who is a cultural specialist in the Nez Perce Tribal Cultural Resource Program (Pinkham Decl. (Dkt.# 9) ¶ 2), Plaintiffs point out that the Pacific lamprey is "a culturally significant, treaty-reserved resource that ha[s] been integral to the spiritual, physical, and economic health of the Nez Perce Tribe since time immemorial." (*Id.* at 22.) Indeed, the Corps has acknowledged that the Pacific lamprey is a culturally significant re-

---

7. Although the injunction at issue in *Monsanto* was a permanent, rather than a preliminary, injunction, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546, n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

source to local tribes. (Shutters Decl. (Dkt.# 33) ¶ 4 (citing EIS § 3.1.4.2).)

The harm Plaintiffs alleged to the Tribe, however, is based derivatively on the harm they allege to the Pacific lamprey. Although Mr. Pinkham testifies persuasively concerning the significant relationship that exists between the Nez Perce Tribe and the Pacific lamprey (*See generally* Pinkham Decl.; *see id.* ¶ 7 ("[Pacific lamprey] are integral to the spiritual, physical and economic health of the Tribe since time immemorial")), he never states that the Corps' proposed dredging action is likely to inflict irreparable harm upon that relationship. Instead, Plaintiffs rely upon the declaration of David Statler, the Director of Resident Fisheries for the Department of Resources for the Nez Perce Tribe (Statler Decl. (Dkt.# 10) ¶ 2), to establish harm to the Pacific lamprey. Thus, to establish a likelihood of irreparable harm to the Nez Perce Tribe, Plaintiffs must demonstrate a likelihood of irreparable harm to the Pacific lamprey. Likewise, if Plaintiffs fail to establish a likelihood of irreparable injury to the Pacific lamprey, they also fail to establish a likelihood of irreparable injury to the Tribe.

Based upon the declaration of Mr. Statler, Plaintiffs argue that the Corps' planned dredging this winter "will likely result in irreparable harm to Pacific lamprey." (Mot. at 22 (citing Statler Decl.).) The challenge for the court is to determine if the evidence Plaintiffs have garnered carries their burden of persuasion with regard to this element of the *Winter* test "by a clear showing." *Mazurek*, 520 U.S. at 972, 117 S.Ct. 1865 (1997); *Lopez*, 680 F.3d at 1072. In his declaration, Mr. Statler opines that "the occurrence of Pacific lamprey at moderate to high relative densities within the footprint of the proposed channel maintenance is likely." (Statler Decl. ¶ 35.) Although the Pacific lamprey is not listed as an endangered species un-

der the Endangered Species Act ("ESA"), it is included as a state sensitive species in Washington and Oregon, an endangered species in Idaho, a designated tribal trust species, and a "species of special concern" by the U.S. Fish and Wildlife Service. (Statler Decl. ¶ 14.) Further, Mr. Statler testifies that there has been "a decline in abundance and distribution of Pacific lamprey" in recent decades. (*See id.* ¶ 13.) As a result, the Nez Perce Tribe has initiated specific Pacific lamprey conservation and restoration efforts. (*See id.* ¶¶ 15–23.)

The Corps disputes these factual contentions. The Corps argues that, contrary to Plaintiffs' assertions, the evidence Mr. Statler relies upon, which consists of sampling in other areas of the lower Snake River, does not support his conclusions concerning the presence of Pacific lamprey at the proposed dredging sites. (Resp. at 9 (citing Statler Decl. ¶¶ 26–27 (noting collection locations for lamprey counts at variance from the proposed dredging locations)).) Indeed, the Corps notes that it specifically surveyed for larval juvenile lamprey (which live in sediment) in areas that contained potential habitat for these animals within the proposed dredging sites and found not a single such individual at any of the sample points. (Shutter Decl. ¶¶ 5–6, 8.) In addition, based on data from more recent adult lamprey counts, the Corps also asserts that the species in no longer in a descending population trend. (Shutter Decl. (Dkt.# 33) ¶ 15.)

The court, however, does not need to resolve the parties' factual disputes concerning population trends of the Pacific lamprey or the location of individual lamprey within the dredging zone. Even if Plaintiffs are correct on these issues, they nevertheless fail to carry their burden of persuasion "by a clear showing" that the Corps' planned winter maintenance dredging activity on the lower Snake River will

likely result in irreparable harm to the Pacific lamprey. *See Mazurek,* 520 U.S. at 972, 117 S.Ct. 1865 (italics omitted). In his declaration, Mr. Statler never expressly opines that the Corps' proposed dredging will likely result in irreparable harm to the lamprey. Rather, he concludes that "likely *potential* impacts and harm to Pacific lamprey *can* result from disturbance from dredge activities, and *can* include harassment, direct injury (including mortality) and increased susceptibility to predation." (Statler Decl. ¶ 35 (italics added).) This statement that "likely potential impacts and harm ... can result from ... dredging activities" falls short of opining that the Pacific lamprey is likely to suffer irreparable harm as a result of the Corps' planned dredging. Indeed, the use of the terms "potential" and "can" connotes the mere possibility of such effects. The Supreme Court has made clear since its decision in *Winter* that the mere possibility of irreparable harm is insufficient for the court to issue the extraordinary remedy of a preliminary injunction. *Winter,* 555 U.S. at 22, 129 S.Ct. 365 (holding that "the Ninth Circuit's 'possibility' standard is too lenient").[8]

In addition, Mr. Statler opines that "the proposed 2014–2015 dredging project has a high likelihood to harm or kill individual lamprey ... in areas where juvenile lamprey are present," and therefore "the Corps has substantially understated the likelihood and magnitude of potential harm to this critically imperiled species as a result of the project activities." (Statler Decl. ¶ 37.) This statement also falls short of meeting Plaintiffs' burden of persuasion on the issue of the likelihood of irreparable harm. The court is persuaded that even if the Corps' proposed dredging is likely to harm or kill individual lamprey, this fact is insufficient to establish a likelihood of irreparable harm or warrant the issuance of a preliminary injunction. Indeed, if the demise of individual animals was all that was necessary to demonstrate a likelihood of irreparable harm, then logically every permitted take of animals under the Endangered Species Act ("ESA") would satisfy this factor of the *Winter* test for preliminary injunction. The court is not convinced that this is the case. Even in the context of species more imperiled than the lamprey—those that, unlike the lamprey, are listed as threatened or endangered under the ESA—courts require a showing that the identified harm to the species is " 'significant' vis-a-vis the overall population," and not just that individual animals are likely to be injured.[9] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,* 606 F.Supp.2d 1195, 1210 (E.D.Cal. 2008); *see also Defenders of Wildlife v. Salazar,* 812 F.Supp.2d 1205, 1209–10 (D.Mont.2009) (ruling that plaintiffs failed to establish that irreparable harm existed through the deaths of individual wolves where there was no evidence that the loss "would be significant for the species as a whole"); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs,* 817 F.Supp.2d 1290, 1315 (D.Or.2011) (ruling that irreparable harm "must be measured at the *species* level" in the context of an ESA challenge) (italics in original); *Wild Equity Institute v. City and Cnty. of San Francisco,* No. C 11–00958 SI, 2011 WL

---

8. Mr. Statler also opines that "there is a high likelihood of *negative impacts* to juvenile lamprey already present in the project area." (Statler Decl. ¶ 30 (italics added).) This statement concerning "negative impacts," however, does not rise to the required level of "irreparable harm" required under *Winter,* 555 U.S. at 20, 129 S.Ct. 365.

9. Indeed, the Endangered Species Act permits incidental takings of a listed species, *see* 16 U.S.C. § 1536(b)(4), and Plaintiffs apparently acknowledged in their prior litigation concerning the Corps' dredging of portions of the lower Snake River that " 'take' of an endangered species is permissible under the ESA," *Nat'l Wildlife Fed'n,* 235 F.Supp.2d at 1161.

5975029, at *6–7 (N.D.Cal. Nov. 29, 2011); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 796 (9th Cir.2005) (holding that a preliminary injunction is appropriate upon a showing of "irreparable harm to a threatened species").

Courts that have found irreparable harm stemming from the deaths of a small number of individual animals have done so when the "loss of those individuals would be significant for the species as a whole." *See Gutierrez*, 606 F.Supp.2d at 1210, n.12 (citing cases). Nowhere, however, does Mr. Statler opine that the likely loss of individual lampreys as a result of the Corps' proposed dredging will be significant for the species as a whole or result in irreparable harm thereto.[10] (*See generally* Statler Decl.) Indeed, he does not even opine that the likely loss of individuals will be significant for that portion of the spe-

cies located within the Snake River. (*See generally id.*)

Courts have also found irreparable injury from the deaths of individual animals where plaintiffs have established an affinity for or an aesthetic interest in the particular, individual animals at issue. *See, e.g., Humane Soc. of U.S. v. Bryson*, No. 3:12–cv–00642–SI, 2012 WL 1952329, at *6 (D.Or. May 30, 2012) ("Because Plaintiffs value individual [California sea lions], including some identified by the Agency and the States for lethal removal, these declarations are sufficient to establish an imminent harm that is likely to occur.... Moreover, that harm is irreparable."); *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 14 (D.D.C.1998) (finding irreparable harm where plaintiffs lived near and enjoyed the bison in national parks, and "seeing or even contemplating the type of treatment of the bison inherent in an orga-

---

**10.** Plaintiffs assert that numerous cases in this Circuit have rejected the notion that irreparable harm is measured at the species level. (*See* Reply at 19.) The cases Plaintiffs rely upon, however, are distinguishable. In *National Wildlife Federation v. Burlington Northern Railroad, Inc.*, the Ninth Circuit affirmed the district court's denial of injunctive relief based on the absence of evidence of future deaths of members of a protected species, namely grizzly bears. 23 F.3d 1508, 1512 (9th Cir.1994). This is not tantamount to a statement that the death of individual animals would constitute irreparable harm. In fact, the court clarified that the standard for an ESA injunction is the showing of "a definitive threat of future harm to protected species." *Id.* at 1512 n. 8. Plaintiffs also rely upon *Humane Society of the United States v. Gutierrez*, 523 F.3d 990 (9th Cir.2008), in which the Ninth Circuit made the conclusory statement that "the lethal taking of the California sea lions is, by definition, irreparable." *Id.* at 991. The quoted statement is clearly not meant to establish a rule applicable to different species and circumstances, as the same order finds that the taking of approximately 2,000 protected fish would not result in irreparable harm. *Id.* (concluding that appellees failed to show that a stay pending

appeal would result in irreparable harm based on the loss of up to 2,094 ESA-listed spring Chinook salmons). Indeed, one could argue that *Gutierrez* actually supports the Corps', rather than Plaintiffs', position. Plaintiffs cite *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir.1995), for the proposition that "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." First, the Pacific lamprey is not an endangered species, and even if it was, this statement does not contradict the Corps' position here concerning irreparable harm. In *Makua v. Rumsfeld*, 163 F.Supp.2d 1202 (D.Haw.2001), the court found that "[b]ecause the species are not stable, the loss of a single individual could result in the extinction of the species no matter what management actions are taken for the remaining individuals." *Id.* at 1221. Plaintiffs provide no evidence that the Corps' dredging activities here could result in the extinction of the Pacific lamprey. Thus, *Makua* is also distinguishable. The court reviewed the remainder of the cases cited by Plaintiffs (*see* Reply at 19), and concluded that they are factually dissimilar and of little value in assessing irreparable harm here.

nized hunt would cause them to suffer an aesthetic injury that is not compensable in money damages"); *Fund for Animals v. Espy*, 814 F.Supp. 142, 151 (D.D.C.1993) (finding irreparable harm where each plaintiff "enjoys the neighboring Yellowstone bison in much the same way as a pet owner enjoys a pet, so that the sight, or even the contemplation, of treatment in the manner contemplated of the wild bison, which they enjoy and have seen and are likely to see capture for the program would inflict aesthetic injury"); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 220–21 (D.D.C.2003) (collecting cases holding that the killing of animals causes irreparable harm to those with a special interest in the individual animals).

If the foregoing cases were applicable, then Mr. Statler's opinion that "the proposed 2014–2015 dredging project has a high likelihood to harm or kill individual lamprey" (Statler Decl. ¶ 37) might be sufficient to establish irreparable harm to the Nez Perce Tribe. Those cases, however, are not relevant to the facts here. The evidence before the court establishes that the Nez Perce Tribe has a relationship with the Pacific lamprey species as a whole, and not with individual animals. (*See* Pinkham Decl. ¶ 7 ("The relationship between Pacific lamprey and Nez Perce people must endure.").) Indeed, Mr. Pinkham states that "as long as there are Pacific lamprey swimming upstream and there are Nez Perce to catch some of them I know that my grandchildren will be bet-

ter off because the ecosystem will be more stable than if they weren't here." (*Id.*) Thus, the Tribe's relationship is not with individual fish, which they themselves catch and kill. (*See id.* ¶¶ 4–5.) Rather, the Tribes' relationship is with the species generally and its interest is in the continuity of the species as a whole. (*See generally id.*) Thus, Mr. Statler's conclusion that individual lamprey will likely suffer irreparable harm does not equate to irreparable harm to the Tribe. If there was evidence before the court that the Corps' dredging action was likely to cause irreparable harm to the species in general or even to that portion of the species generally that exists in the lower Snake River, then the court's conclusion concerning irreparable harm to the Tribe might be different, but (as noted above) there is no such evidence here.

Thus, the court concludes that Plaintiffs have failed to demonstrate that irreparable harm is likely to occur to the Pacific lamprey. Further, because Plaintiffs have failed to make a strong showing that irreparable harm to the Pacific lamprey is likely, they have also failed to establish a likelihood of irreparable harm to the Nez Perce Tribe.[11]

Plaintiffs alternatively argue that the National Marine Fisheries Service's ("NMFS") conclusion that "take" of listed salmonids will result from the Corps' proposed dredging translates into a finding of irreparable harm to the species *per se.* (Mot. at 23–24; *see also id.* at 24, n.26 ("The fact that NMFS has permitted the

---

**11.** The court also notes that the Corps has been maintaining the navigation channel on the lower Snake River for more than 50 years, and has "historically used dredging as its primary method of removing accumulated sediment." (*See* EIS at 1–1.) Thus, this is not a case where consequences of the Corps' dredging activities are largely unknown. *See Winter*, 555 U.S. at 23, 129 S.Ct. 365 (finding "it pertinent that this is not a case in which the defendant is conducting a new type of

activity with completely unknown effects on the environment"). Indeed, in the winter of 2005/2006, the Corps dredged the same area it proposes to dredge this winter. As part of their 2005 settlement agreement with the Corps, Plaintiffs expressly consented to the 2005/2006 dredging (Compl.Ex. 2), and apparently expressed no concerns about Pacific lamprey during that period of time, *see Nat'l Wildlife Fed'n*, 235 F.Supp.2d at 1161–62.

take does not equate to a lack of irreparable harm").) The court notes, however, that Plaintiffs have not challenged the underlying dredging biological opinion or NMFS's permitting of the incidental "take" of salmonids. Further, Plaintiffs' argument was rejected in *Audubon Society of Portland v. National Marine Fisheries Service*, 849 F.Supp.2d 1017, 1049 (D.Or.2011). In that case, the plaintiffs challenged NMFS's conclusion that dredging would not jeopardize listed species, and sought an injunction based on the authorized "take" of listed species established in the underlying biological opinion. *Id.* The court rejected the plaintiffs' argument because they failed to point to any specific information in the biological opinion indicating that the species was in jeopardy. *Id.* Here, Plaintiffs' position is even less defensible because they have failed to challenge the NMFS's biological opinion at all. Having failed to undertake this challenge, the court rejects their argument that they are irreparably harmed as a result of a permitted take of salmonids.[12]

In sum, the court concludes that Plaintiffs have failed to establish a likelihood of irreparable harm arising from the Corps' planned dredging activities on the lower Snake River this winter. Plaintiffs' failure to establish this requisite element is fatal to their motion for a preliminary injunction under either the test in *Winter* or the revised sliding-scale test of *Cottrell*. *See Cottrell*, 632 F.3d at 1135; *Winter*, 555 U.S. at 24, 129 S.Ct. 365.

## C. Balance of the Equities[13]

In addition to failing to demonstrate that irreparable harm is likely in the absence of a preliminary injunction, Plaintiffs also fail to demonstrate that the balance of equities tips in favor of issuing a preliminary injunction.[14] *See Winter*, 555 U.S. at 20, 129 S.Ct. 365. Although "the balance of harms will usually favor the issuance of an injunction to protect the environment," the law does not require abandonment of a balance of equities analysis just because a potential environmental injury is at issue. *Carlton*, 626 F.3d at 475. Rather, courts must "balance all of the competing interests at stake" including potential economic harm. *Id.* ("Economic harm may indeed be a factor in considering the balance of equitable interests."). Further, "[t]he assignment of weight to particular harms is a matter for district courts to decide." *Id.*

---

12. Further, Plaintiffs argument concerning harm to salmonids again rests on the notion that the "take" of even one listed salmon or steelhead is an irreparable harm. As discussed above, courts in this district have rejected this notion in favor of a standard that assesses effects on the species as a whole.

13. In 2004, the court found that the balance of equities favored a preliminary injunction against similar dredging by the Corps on the lower Snake River. (*See* Compl. Ex. 1 at 25–29.) However, in doing so, the court relied in part upon case authority indicating that "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction." (*Id.* at 25 (quoting *High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886, 898 (9th Cir.2004)).) As discussed above, the Supreme Court has since clarified that NEPA does not place a "thumb on the scales" in favor of issuing an injunction. *Monsanto Co.*, 561 U.S. at 157, 130 S.Ct. 2743.

14. Under the Ninth Circuit's revised balancing test, if the plaintiff has raised only serious questions going to the merits, rather than a likelihood of success on the merits, then the balance of equities must tip sharply in the plaintiff's favor. *Cottrell*, 632 F.3d at 1134–35. The court declines to evaluate whether Plaintiffs have demonstrated a likelihood of success on the merits or serious questions going to the merits because it is unnecessary in this context. Irrespective of whether Plaintiffs must demonstrate that the balance of equities tips in their favor or tips sharply in their favor, they fail to accomplish either task here.

As discussed above, Plaintiffs argue that harm will accrue to the Pacific lamprey and various salmonids if the court does not issue a preliminary injunction and the Corps proceeds with its planned dredging on the lower Snake River. Plaintiffs argue that the harm to these imperiled species outweighs any harm suffered by the Corps or the navigational interests represented by Interveners. (Mot. at 25–26.) The court disagrees.

The Corps argues persuasively that imposition of a preliminary injunction against dredging will undermine full implementation of measures that NMFS has determined are necessary to ensure the ongoing protection of salmon and steelhead listed as threatened and endangered species under the ESA. Congress has charged NMFS with evaluating effects on listed salmonids, see 50 C.F.R. § 402.01(b), and pursuant to that charge, NMFS issued a biological opinion for the Federal Columbia River Power System that addresses the Corps' operation of the LSRP, including Lower Granite Dam. (Vail Decl. ¶ 6 & Ex. A; see also EIS at xii, 1–5.) The biological opinion directs the Corps to operate the LSRP within one foot of MOP from April through the beginning of September each year, unless an adjustment is necessary to meet authorized project purposes–such as navigation. (Vail Decl. ¶ 6 & Ex. A; see also EIS at xii, 1–5.) The measures required by the NMFS biological opinion are intended to aid in downstream juvenile salmon migration through the reservoir. (Vail Decl. ¶ 6 & Ex. A.) Although NMFS has recognized that the Corps may employ limited adjustments to these operations, NMFS has also clearly specified that operating the LSRP at or near MOP is the most beneficial to listed and endangered salmonids. (See generally id. Ex. A.) Nevertheless, due to the current navigational impairments, the Corps has found it necessary to raise the pool level at Lower Granite Dam in order to implement Congress's navigational directive and to ensure safe navigation. (Id. ¶ 6; see also EIS at xii, 1–5.)

The Corps argues that, if the court imposes an injunction against its proposed dredging, it will be forced to continue to elevate the pool level at the Lower Granite Dam in contravention to the operational parameters that the NMFS found in its biological opinion to be most beneficial to listed salmonids. (Resp. at 26.) The Corps argues that an injunction that hinders full implementation of NMFS's biological opinion is not in the public interest and weighs against issuing the preliminary injunction.[15] The court agrees. It makes

15. Plaintiffs argue that the Corps' concern about continuing to impact salmon through higher reservoir levels during the salmon migration season is "puzzling" because "it is the Corps itself that has made the operational decision" to make adjustments to the directives of the NMFS's biological opinion in recent years. (Reply at 20.) This argument ignores the plain language of the Flood Control Act of 1962 that "the Columbia–Snake River barge navigation project shall be established as fourteen feet and two hundred and fifty, respectively, at minimum regulated flow." Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, 1193 (1962). The Corps has raised the level of the reservoirs in an attempt to comply with this legislative language and to ensure safe navigation. (See Resp. at 26.) Even if the language of the Act concerning the depth of the channel is not mandatory, as Plaintiffs suggest (see Mot. at 7–8), this does not mean that the Corps can ignore the hazards to navigation that are discussed above and simply "choose" to operate the LSRP at lower reservoir levels. As has been discussed above, the Corps is congressionally authorized to operate the LSRP for a variety of purposes, including commercial navigation, recreation, fish and wildlife conservation, and flow conveyance. (EIS at 1–1.) The level at which the reservoirs can be safely operated for these purposes is a technical issue requiring specific and in-depth scientific knowledge. In these circumstances, it is not the role of the court to second-guess agency decisions. See Nat'l Wildlife Fed'n v. U.S.

little sense to issue a preliminary injunction to protect against alleged harm to Pacific lamprey when the result will undermine full implementation of the LSRP operational parameters recommended by NMFS that are designed to benefit other listed and endangered species.

Added to the environmental concerns weighing against the injunction are the navigational hazards and associated costs cited by Interveners that result from the sedimentation. Interveners cite to numerous vessel groundings that have occurred since 2008. (*See* Lyons Decl. (Dkt.# 39) ¶¶ 7–9; Keffer Decl. (Dkt.# 42) ¶ 10; Rich Decl. (Dkt.# 44) ¶ 9.) Although it may seem obvious, as the Corps has explained, these groundings "can cause damage to vessels/property, personal injury/death and unintended release of harmful cargo/chemicals." (EIS App. L at L12.) Although no injuries or lost cargo has occurred yet, there have been close calls. In 2012, a grounded barge trapped two crew members on board who had to be rescued through a 911 call. (Lyons Decl. ¶¶ 7–10.) Just because more tragic consequences to personnel or the environment have yet to occur, the court is not required to ignore the serious risks to life, property, and the environment that are caused by sedimentation in the navigation channel.

Plaintiffs argue that risks to navigation can be minimized by modifying operations or utilizing measures other than dredging. (Reply at 21.) The court agrees and the record indicates that many users of the Snake River navigation channel do just that by slowing a tow, moving outside the center channel to hug the shoreline, avoiding key turning basins, light loading barges, and reducing or altering operations. (Nordstrom Decl. ¶ 3; Reed Decl. (Dkt.# 40) ¶¶ 5–8, 10.) However, these efforts are also associated with additional costs and risks for those who use the

channel (*see, e.g.,* Nordstrom Decl. ¶¶ 5–6; Reed Decl. ¶ 8; Lyons Decl. ¶ 4), and cannot eliminate the risks and uncertainties of navigating through areas with sedimentation (*see, e.g.,* Nordstrom Decl. ¶¶ 3–4; Lyons Decl. ¶ 6).

Plaintiffs assert that the court should disregard the harms raised by the Corps and Interveners because they "amount to short-term financial impacts that can themselves be mitigated, and, by definition are not irreparable." (Reply at 20.) However, the Ninth Circuit has stated that "[e]conomic harm may indeed be a factor in considering the balance of equitable interests." *Carlton*, 626 F.3d at 475 (holding, on appeal of denial of preliminary injunction to halt post-wildfire logging in a national forest, that the district court did not err in determining "the economic stakes, in combination with the safety concerns and reforestation efforts, outweighed any harm to environmental interests"). In any event, the countervailing ecological concerns regarding optimizing LSNP operations for threatened and enlisted salmonids and the serious safety concerns involved with sedimentation in the navigation channel can hardly be characterized as merely "short-term financial impacts." The Ninth Circuit has declined preliminary injunctive relief in NEPA cases where the public interest in allowing a project to continue outweighed the harm of environmental injury asserted by the plaintiffs. *See W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir.2012), (upholding a denial of a preliminary injunction where the district court properly weighed the environmental harm posed by the project against the possible damage to project funding, jobs, and the state and national renewable energy goals that would result from an injunction halting project construction, and concluded that the balance

*Army Corps of Engineers*, 384 F.3d 1163, 1180 (9th Cir.2004).

favored defendants); *The Lands Council v. McNair,* 537 F.3d 981, 1005 (9th Cir. 2008) (upholding a district court's finding that the balance of hardships did not tip sharply in plaintiff's favor even though plaintiff demonstrated environmental harm because the project's benefits to the public, i.e., decreasing the risk of forest fires and insect infestation and preventing job loss at timber companies, were significant). Here, the court likewise concludes that, when weighing the equities, the factors and concerns raised by the Corps and Interveners tip the balance against issuing a preliminary injunction.

### D. Public Interest

In considering a motion for preliminary injunction, the court also examines whether the injunction will serve the public interest. *See Winter,* 555 U.S. at 20, 129 S.Ct. 365. Although this inquiry is at times subsumed within the balancing of hardships or equities, it "deserves separate attention in cases where the public interest may be affected." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 766 (9th Cir.2014). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Id.* Although when the government is a party the last two factors of the test for preliminary injunction merge, "the [I]ntervenors' interests in this case make it appropriate to consider the factors separately." *Id.*

Plaintiffs argue that protecting the Pacific lamprey and certain salmonids by preliminarily enjoining the Corps' planned dredging is in the public interest. (Mot. at 25.) Courts have recognized that ensuring protection of the environment serves an important public interest. *See McNair,* 537 F.3d at 1005 ("[P]reserving environmental resources is certainly in the public's interest."); *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1177 (9th Cir.2006) ("The preservation of our environment, as required by NEPA ... is clearly in the public interest.), *overruled on other grounds by Winter,* 555 U.S. at 22–23, 129 S.Ct. 365. The Corps, however, has asserted that there are environmental costs to imposing a preliminary injunction as well. As discussed above, if the Corps cannot perform maintenance dredging on the navigational channel this winter, then to mitigate the growing risks to safe navigation, it will be forced to continue operating certain reservoirs at water levels that are higher than those that the NMFS has determined are optimal for migrating juvenile salmons. In addition, the risk to navigation created by sedimentation also carries risks to the environment in the event of a grounding that causes a release of toxic material into the lower Snake River. Thus, the court cannot conclude that Plaintiffs have met their burden of demonstrating that the public's interest in preserving environmental resources is served more by imposing an injunction than not imposing it.

As discussed above, the Intervenors' interests here are primarily in safe navigation on the lower Snake River. The Ninth Circuit has previously ruled that "[o]ur laws ... reflect a strong public interest in safe navigation on the high seas." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,* 725 F.3d 940, 946 (9th Cir.2013). Although the lower Snake River is not on the high seas, the court can discern no reason to conclude that safe navigation on inland waters is not also in the public interest. Indeed, Congress has expressly authorized the Corps to maintain a navigation channel on the lower Snake River, *see* Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, 1193 (1962), and has appropriated funds multiple times since the 1980s for the Corps to conduct maintenance dredging actions involving the LSRP, including the most re-

cent dredging action in the winter of 2005/2006, in order to restore the navigation channel to a depth of 14 feet consistent with the Flood Control Act of 1962 (*see EIS* at 3–55). Based on the forgoing, the court cannot conclude that Plaintiffs have met their burden of demonstrating that the preliminary injunction they seek is in the public interest.

Because the court has found that Plaintiffs have failed to demonstrate three of the required elements necessary for issuance of a preliminary injunction (that there is a likelihood of irreparable harm in the absence of an injunction, that the balance of equities favors an injunction, and that an injunction would be in the public interest), the court DENIES Plaintiffs' motion for a preliminary injunction.[16]

### E. Conduct of the Remaining Litigation

Now that the court has resolved Plaintiffs' motion for a preliminary injunction, the court expects the parties to proceed promptly with the remainder of this case. The last time the parties litigated in this court, they came to an agreed resolution in which the Corps committed to conduct review under NEPA for a long-term approach to sediment management on the lower Snake River and to issue a final environmental impact statement and record of decision by 2009. (*See* Compl. Ex. 2.) The Corps, however, did not meet those obligations until 2014. (*See* Compl. ¶ 1.) The court will not tolerate that type of delay in this case. The court also notes, however, that despite Plaintiffs' complaints about the Corps' lengthy delay in fulfilling its commitment to conduct a review under NEPA, Plaintiffs sat on their rights and did not bring the Corps' delay to the court's attention. Although the Corps' de-

lay certainly appears excessive, Plaintiffs also had an obligation to seek enforcement of their rights, and their utter failure to do so for more than five years is also viewed with disfavor by the court. The court will issue a scheduling order regarding the parties' conduct of the remainder of this litigation. The court places the parties on notice that, absent good cause, it intends to strictly enforce the deadlines in that order and to move the parties promptly to final resolution of this matter.

### IV. CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' motion for preliminary injunction (Dkt.# 8).

---

**16.** Because it is unnecessary, the court declines to consider the sole remaining element that are Plaintiffs must demonstrate to justify the issuance of a preliminary injunction–the likelihood of Plaintiffs' success on the merits.